UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-10471-GAO

SHERMAN V. OLSON,
Plaintiff,

v.

SOVEREIGN BANCORP, INC., and
SOVEREIGN BANK,
Defendants and Third Party Plaintiffs,

v.

PHIL A. JENKS, individually and as
Trustee of THE SHERMAN V. OLSON
CHARITABLE REMAINDER UNITRUST,
Third Party Defendant.

OPINION AND ORDER
February 28, 2012

O'TOOLE, D.J.

The plaintiff, Sherman V. Olson, brought this action against Sovereign Bank and Sovereign Bancorp, Inc. (now Santander Holdings USA, Inc.) (together "Sovereign"), for damages he claims to have suffered as the result of a transaction that led to the assessment of a sizable, and according to Olson, avoidable, capital gains tax. The second amended complaint sets forth multiple alternate claims, all but one seeking the same relief; that one seeks multiple damages and attorneys' fees. In turn, Sovereign removed the action to this Court and subsequently filed a third-party indemnity and contribution claim against Olson's attorney, Philip A. Jenks ("Jenks"). Sovereign and Jenks have moved for summary judgment.

## I.   Background

In 2004, Olson was the president and principal shareholder of Danafilms, Inc. He decided to sell thirty percent of his stock to the company's employees through an Employee Stock Ownership Plan ("ESOP"). Under Section 1042 of the Internal Revenue Code,[1] so long as the proceeds Olson received in the transaction were held in "Qualified Replacement Property" ("QRP"), any recognition by Olson of a capital gain would be deferred.

Danafilms had had an extended banking relationship with Sovereign, but Olson had not personally done banking with Sovereign. Prior to the ESOP closing, Sovereign approached Olson in an effort to become the investment manager of the ESOP rollover proceeds. Olson declined the suggestion and instead opened a custody account with Sovereign. The Custody Agreement he executed is the only express written contract between the two parties concerning the ESOP funds. The short, four-page agreement specifically states that Sovereign will provide no tax services. Additionally, the contract states, "I fully understand that you will act only as custodian and that you will have no duties other than those specifically set forth in this Agreement." (Def.'s Statement of Undisputed Facts, Ex. 5, at 2.) The remaining sections of the contract do not give any investment authority to Sovereign, nor do they include any information about types of assets, transfers of funds, or specific types of investments. Daniel Henderson, a Wealth Management Advisor for Sovereign, oversaw Olson's account.

The custody account is what is referred to in the banking industry as a non-discretionary account, because the custodian has no discretion to invest the funds except at the instruction and authorization of the account owner. The Custody Agreement makes no mention of who may give instructions on Olson's behalf, nor does it address the form and type of instructions necessary to carry out transactions involving the account.

---

[1] Section 1042 bears the caption, "Sales of stock to employee stock ownership plans or certain cooperatives."

In October 2004, Olson received more than $6 million in proceeds from the ESOP closing. The funds were deposited in the custody account and invested in 6,100,000 shares of General Electric Capital Corp. Discounted Corporate Paper (the "GE shares"), an investment that satisfied the QRP requirement of IRS section 1042. It is not clear from the record who instructed Sovereign to invest the proceeds in that way. It is undisputed that third party defendant Phil Jenks, Olson's personal counsel who handled the ESOP closing, also personally represented Olson in connection with Olson's 2004 tax planning. The GE Shares matured and were redeemed on December 1, 2004, in accordance with the terms of the investment. Olson's funds in the Sovereign custody account were thereafter held in a liquid Federated Massachusetts Municipal Bond Fund, a holding that did not, according to the IRS later, satisfy the QRP requirement.

On December 31, 2004, Olson created a Charitable Remainder Unitrust ("CRUT"). To fund the trust, at Olson's request made through a representative, $3 million held in the Mass. Muni Bond Fund was converted to cash and transferred from the Sovereign custody account into the CRUT account. The mechanics of this transaction had been discussed via emails and phone calls between Olson, Jenks, representatives of Sovereign, and Olson's estate planning attorney.

Daniel Henderson of Sovereign prepared and sent to Olson two documents for him to sign in connection with the funding of the CRUT. The first, back-dated to November 1, 2004, authorized Sovereign to purchase GE Commercial Paper and subsequently reinvest it on maturity. (The November 1 date was consistent with the original deposit of the ESOP proceeds in the Sovereign custody account.) The second document, dated December 31, 2004, was an authorization to move $3 million from the custody account into the newly created CRUT account. This authorization is only one paragraph long and states simply, "I authorize you to debit my Sovereign Trust & Wealth Management Custody account # 1055001592 the sum of $3,000,000 which is to be transferred to

3

fund the newly created Sherman V. Olson Charitable Trust Acct. # 1045001129." (Def.'s Statement of Undisputed Facts, Ex. 7, at 1).

More than two years later, Olson's personal tax returns were audited by the IRS. The IRS determined that the proceeds from the ESOP stock sale had not been properly maintained in QRP, and that Olson consequently lost the deferral afforded by section 1042 and owed a substantial capital gains tax as a result. Olson did not contest the position taken by the IRS and paid the additional tax. He seeks to recover the amount of the additional tax from Sovereign, under a variety of theories.

## II.  Discussion

### A. Contract Claims

Olson asserts claims for breach of an express contract (Count I), breach of an implied contract (Counts II and III), and breach of the implied contractual covenant of good faith and fair dealing (Count IV). In brief, his general claim is that Sovereign agreed to invest the ESOP proceeds in a way that was consistent with Olson's instructions and that would preserve the tax deferral benefit offered by IRS section 1042 and that Sovereign breached that promise by allowing the funds to be invested in non-QRP property.

Sovereign's position is that the only contract between it and Olson, express or implied, was the Custody Agreement, under which Sovereign was merely a passive custodian. It says further that the only instructions it received from Olson were the initial instruction to invest the funds in the GE shares and the December 31 instruction to "debit" the account $3 million and transfer that amount to the CRUT account. In particular, Sovereign argues that in the absence of other specific instructions, it had no duty under the Custody Agreement to monitor the investment in the GE shares or to hold the credits in the custody account in any particular form.

4

The matter cannot be resolved on the summary judgment record. While Sovereign is correct that the only *written* contract between it and Olson was the Custody Agreement, there is evidence from which the existence of an express, and perhaps implied, oral promise to keep the ESOP funds in the GE shares could be found by a trier of fact. For example, the written investment instruction that Henderson prepared for Olson on December 31 and backdated to November 1 contained the instruction to reinvest the funds in GE shares when the first lot had matured. If that reflected an instruction that had actually been given and understood on, say, November 1, as opposed to a post hoc papering over of a prior oversight, then Olson's claim that Sovereign breached its promise to follow instructions when the GE shares matured in December without being reinvested by the custodian may have merit. The matter must be resolved on a full evidentiary basis. Sovereign's motion as to the contract counts is therefore denied.

B.  Other Claims

Olson pleads a number of other theories, but on the summary judgment record, none of them is viable.

In Count V of the Second Amended Complaint, he alleges that Sovereign breached its fiduciary duty to Olson. There is no evidence of a relationship between Olson and Sovereign that would impose a fiduciary duty on the latter. The Custody Agreement, on its own terms, certainly did not make Sovereign a fiduciary; it explicitly limited Sovereign's obligations to those of a passive custodian. Beyond that, there are no other circumstances shown in the record that would have imposed fiduciary responsibilities on Sovereign, apart from some explicit agreement, which has not been shown. In Massachusetts, the relationship between a bank and its customer is generally one of debtor and creditor and does not itself, without more, establish a fiduciary duty. Flaherty v. Baybank Merrimack Valley, N.A., 808 F. Supp. 55, 64 (D. Mass. 1992) (citing National Shawmut Bank v. Hallett, 78 N.E.2d 624, 628 (Mass. 1948)).

5

Count VI alleges breach of an agency relationship. To the extent that the "agency relationship" is meant to suggest that Sovereign, as a matter of independent legal obligation apart from any contract, had duties akin to those arising under a fiduciary relationship, the claim is unsupported in the record for the same reasons that apply to Count V. To the extent the alleged "agency relationship" is said to arise <u>ex contractu</u>, the claim is adequately presented in Counts I through IV.

Count VII alleges negligence. There is nothing in the factual record that would suggest that Sovereign had any common law tort duty of care that was breached in the course of events. Rather, the claim apparently is that Sovereign negligently performed a contractually assumed duty, such as "a duty to invest [Olson's] funds with reasonable care." <u>See</u> Second Amended Complaint, ¶ 107. Whether and when a promisor's performance or non-performance of a promise may be redressable in an action in tort for negligence, as distinguished from a contract action for breach of the promise, are matters that have received uncertain and sometimes inconsistent treatment by courts.

There are cases where a promise to perform a service is held to imply a standard of performance. Professional services contracts are an example. <u>See</u> <u>Klein v. Catalano</u>, 437 N.E.2d 514, 525-26 (Mass. 1982). In these cases, the obligation to use reasonable care is imposed by law independent of the expressed promises, and even perhaps intentions, of the parties. A breach of this independently imposed duty of care can give rise to a claim in tort.

There are other cases where the parties' contract expressly imposes on a promisor an obligation to perform to a particular standard, such as, for example, "to invest . . . with reasonable care." Generally the Massachusetts courts have regarded such matters as a species of warranty and suit for the breach to be one in contract, not tort. <u>See</u> <u>Treadwell v. John Hancock Mutual Life Ins. Co.</u>, 666 F. Supp. 278, 289 (D. Mass. 1987) (citing <u>Anthony's Pier 4, Inc. v. Crandall Dry Dock Engineers, Inc.</u>, 489 N.E.2d 172, 175 (Mass. 1986)).

6

The first circumstance – the imposition of a duty of care by law apart from the parties' agreements – is not present in this case. The second might or might not be, depending on what might be shown to have been an agreement by Sovereign to act in a particular way. The Custody Agreement lacks such an undertaking, but as noted above with respect to the contract claims, it is possible that some other oral or parol agreement could be shown by the plaintiff. Even if that were done, however, the matter would still be a matter for an action of breach of a contractual covenant and not for an action in tort for negligence.

Counts VIII and IX allege, respectively, negligent and intentional misrepresentation. The short answer is that the summary judgment record provides no support for either claim. To the extent the plaintiff would rely on Sovereign's promotional sales pitch regarding investment services, the fact is that the plaintiff spurned the offer. There is no evidence he was seduced by it.

Finally, Count X alleges that Sovereign committed unfair or deceptive acts or practices and seeks a remedy under Massachusetts General Laws, chapter 93A, sections 2 and 9. At best, the plaintiff's allegations may support an action for breach of contract. There is no evidence in the record to support a finding of especial deception or unfairness. An ordinary breach of contract does not amount to an unfair or deceptive act actionable under chapter 93A. See <u>Whitinsville Plaza, Inc. v. Kotseas</u>, 390 N.E.2d 243, 251 (Mass. 1979); <u>Framingham Auto Sales v. Workers' Credit Union</u>, 671 N.E.2d 963, 965 (Mass. App. 1996).

For these reasons, Sovereign is entitled to summary judgment on Counts V through X.

### III. **Jenks' Motion for Summary Judgment**

Third party defendant Jenks moved for summary judgment on Sovereign's claim for contribution under the Massachusetts joint tortfeasor statute. Sovereign's claim is premised on its potential liability to Olson as a tortfeasor. Since Sovereign is the victor on summary judgment on

7

the tort claims, the premise for the third party claim does not exist. That claim is moot, and so is Jenks' motion.

## **IV.**    **Conclusion**

For the foregoing reasons, the defendant's Motion (dkt. no. 48) for Summary Judgment is DENIED as to Counts I, II, III, and IV, and GRANTED as to Counts V, VI, VII, VIII, IX, and X.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge